**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-CR-00233 (ABJ)** |
| **v.** | : | |
| | : | |
| **DYLAN R. CRONIN,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Dylan R. Cronin to 12 months' incarceration, 12 months' supervised release, 60 hours of community service, $500 in restitution, and a $50 special assessment. While Cronin did plead guilty, his destructive and assaultive conduct, combined with his remorseless and false statements to the FBI, all in the context of a riot that was an assault on American democracy, warrants a statutory maximum sentence.

### I.      Introduction

Defendant Dylan R. Cronin, a 26-year-old former U.S. Army Reservist and information technology technician, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on October 21, 2022, (ECF No. 50 at ¶ 6) reflects a sum of more than $2.7 million for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol were $2,881,360.20. That amount

Cronin pleaded guilty to Count One of the Information under 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds, and Count Seven of the Information under 18 U.S.C. § 1361, Damaging Property of the United States. As explained herein, a sentence of 12 months' incarceration is appropriate in this case because Cronin: (1) was near the front of the barricade line on the Upper West Plaza where he witnessed violence between other rioters and police officers, including various assaults, deployment of tear gas, chemical spray, and fire extinguishers, and the detonation of a flashbang, but nonetheless joined a mob of hundreds who advanced forward to enter the Capitol building; (2) sprayed a fire extinguisher at police on the Upper West Plaza; (3) assisted in the first breach of the Capitol building by kicking at the Senate Wing Door from the outside and then by using a piece of lumber to break a window pane ; (4) was the thirteenth rioter to enter the Capitol building; (5) traveled to several different locations at the Capitol; (6) joined and encouraged other rioters to join the surge of rioters toward the House Chamber; (7) entered the Capitol building three different occasions, twice through the Senate Wing Door, and once through the Upper House Door; and (8) did not leave voluntarily, but rather stayed inside until he and other rioters were forced out of the building.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the 3553(a) factors, particularly the facts and circumstances of Cronin's crime, his lack of remorse, and the need for the sentence to afford adequate deterrence, support a sentence of 12 months' incarceration.

---

reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

## II.        Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

The government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 50 (Statement of Offense), at ¶¶ 1-7.

*Cronin's Role in the January 6, 2021 Attack on the Capitol*

Defendant Dylan R. Cronin (Cronin), who lives in Puyallup, Washington, traveled to Washington, D.C. with his father, co-defendant Kevin M. Cronin[2] (Cronin Sr.), and brother, co-defendant Kevin M. Cronin II[3] (Kevin), to attend the "Stop the Steal" rally on January 6, 2021. Cronin wore a green military-style plate carrier with a Confederate flag patch, black hard-knuckle tactical gloves, and a red hat with white "Make America Great Again" lettering. Throughout his time in Washington, D.C., and at the Capitol, Cronin was holding a cell phone, which he used to record video of the events—video the FBI was not able to recover. Below is an image showing all three Cronins on January 6. Cronin is shown in the middle of the three.

---

[2] Government's Sentencing Memorandum for Cronin Sr., the father of the defendant, is attached as "Exhibit 1," and contains additional images relevant to Dylan Cronin's conduct on January 6.

[3] Government's Sentencing Memorandum for Kevin, the brother of the defendant, is attached as "Exhibit 2," and contains additional images relevant to Dylan Cronin's conduct on January 6.



*Image 1, a still from Exhibit 3, Timecode 0:35 – Cronin Sr., Cronin, and Kevin (left to right)
in Washington, D.C. on January 6*

Cronin, Cronin Sr., and Kevin were present at the rally for the beginning of President

Trump's speech; between 12:00 and 1:00 p.m., Cronin, Cronin Sr., and Kevin marched to the

Capitol building.

By approximately 2:00 p.m., Cronin, Cronin Sr., and Kevin had made their way up the

West Front of the Capitol grounds to the Upper West Plaza. Cronin, Cronin Sr., and Kevin were

near the front of the barricade line (Image 2). There, they observed violence between rioters and

police officers, including the deployment of tear gas, chemical irritant sprays, and fire

extinguishers, as further shown in Exhibit 1 (Kevin M. Cronin sentencing memorandum),

Exhibit 2 (Kevin M. Cronin II sentencing memorandum), Exhibit 4 (third-party video), and

Exhibit 5 (third-party video).



*Image 2, a still from Exhibit 4, Timecode 1:36 – Kevin and Cronin (left to right)*
*at Upper West Plaza*

At 2:09 p.m., Cronin and Kevin were at the very front of the police barricade line (Images 3 and 4). Contemporaneous body worn camera video showed a fire extinguisher on the ground near Cronin (Image 4), which he would later pick up and discharge.



*Image 3, a still from Exhibit 5, Timecode 09:08 – Cronin near front of police barricade line*

5



*Image 4, a still from Exhibit 6, Timecode 02:05 – Kevin and Cronin (yellow, left to right) near front of police barricade line, and fire extinguisher (red) on ground*

Six seconds after the above video was recorded, a flashbang detonated directly next to Cronin, Kevin, and Cronin Sr., at 2:09:11 p.m. (Image 5).



*Image 5, a still from Exhibit 5, Timecode 09:11 – Cronin standing next to flashbang detonation*

Five seconds after the detonation, Cronin picked up the fire extinguisher that was next to him on the ground (Images 6 and 7).



*Image 6, a still from Exhibit 5, Timecode 09:16 – Cronin reaching down to pick up fire extinguisher*



*Image 7, a still from Exhibit 5, Timecode 09:18 – Cronin (yellow) holding fire extinguisher (red)*

Three seconds after Cronin picked up the fire extinguisher, he discharged it toward the police line. Below, Image 8 shows the discharge visible on an officer's body worn camera video, and Image 9 shows contemporaneous third-party video where Cronin is visible.



*Image 8, a still from Exhibit 6, Timecode 02:19 – Fire extinguisher discharge (red)*



*Image 9, a still from Exhibit 5, Timecode 09:20 – Fire extinguisher discharge (red) directed towards police barricade line, and Cronin (yellow)*

Discharge from the fire extinguisher drifted towards the police barricade line (Image 10).

Five seconds after the fire extinguisher was discharged, Cronin was recorded on an officer's body worn camera holding a fire extinguisher and standing in the exact area where the discharge had just occurred (Image 11).



*Image 10, a still from Exhibit 6, Timecode 02:22 – Fire extinguisher discharge (red) drifting towards police barricade line, and Kevin and Cronin Sr. (yellow, left to right) wearing face coverings*



*Image 11, a still from Exhibit 6, Timecode 02:25 – Kevin (left) and Cronin Sr. (center) wearing face coverings, and Cronin (right) holding fire extinguisher (red) after attack*

While Cronin denied discharging the fire extinguisher during his debrief interview, the government believes that Cronin was responsible for the attack based on the following: (1) Cronin admitted to picking up the fire extinguisher during his debrief interview, which is corroborated by video evidence (*See* Exhibit 5, Timecode 09:16-09:18); (2) three seconds after Cronin picked up

the fire extinguisher, a fire extinguisher was discharged towards the police barricade line from the exact location where Cronin was standing (*See* Exhibit 5, Timecode 09:20-09:29, and Exhibit 6, Timecode 02:19-02:28); and (3) five seconds after the fire extinguisher was discharged, Cronin was holding a fire extinguisher in the exact location where the fire extinguisher had just been discharged (*See* Exhibit 6, Timecode 02:25).

At 2:10 p.m., less than one minute after the flashbang detonation and Cronin's fire extinguisher attack, Cronin, Cronin Sr., and Kevin left the West Plaza and ascended the Northwest Staircase to the Upper West Terrace.

By 2:11 p.m., a group of rioters, including Cronin, made their way across the Upper West Terrace and Northwest Courtyard to the Senate Wing Door of the Capitol building. *See* Exhibit 5, Timecode 11:00-13:00. Cronin began violently kicking the outside of the door in an attempt to breach the Capitol building.



*Image 12, a still from Exhibit 5, Timecode 11:49 – Cronin kicking Senate Wing Door*

When the group first arrived at the Senate Wing Door, an unidentified male wearing eyeglasses, a blue surgical mask, a red fleece jacket, and a red hat threw a piece of lumber through a windowpane adjacent to the Senate Wing Door. *See* Exhibit 5, Timecode 11:29-11:39. Dominic

Pezzola then used a riot shield to break two lower windowpanes.[4] *See id.*, Timecode 11:51-12:00. Seconds later, Cronin followed suit, picking up and using a piece of lumber to break the lower right pane of a window adjacent to the Senate Wing Door.[5]



*Image 13, a still from Exhibit 5, Timecode 12:02 – Cronin (yellow) breaking window with a piece of lumber (red)*

At 2:13 p.m., the Capitol building was first breached by a rioter who jumped through the window, which Cronin and others had opened with their attacks. Seconds later, Cronin also entered the Capitol building through the window he had just assisted in breaking, becoming the thirteenth rioter to enter the Capitol building on January 6 (Image 14).

---

[4] Pezzola was recently convicted of destruction of property and other offenses in connection with his role breaking the window and other conduct on January 6 in *United States v. Nordean,* 21-cr-175 (TJK).

[5] The Architect of the Capitol provided that the cost to repair the single pane of glass damaged by Cronin and others was $774.00, excluding the costs associated with temporary repairs including the placement of plywood.



*Image 14, a still from Exhibit 7, Timecode 01:24 – Cronin entering Capitol building*

Seconds later, Cronin encouraged two other rioters who had entered through broken windows to kick open the Senate Wing Door from the inside, allowing a flood of additional rioters to enter the building (Image 15). Cronin then stood at entrance of the breached doorway, waved others who were gathered outside to enter, and filmed rioters as they rushed inside. The Senate Wing Door and adjacent windows would become one of the two largest breach points at the Capitol that day.



*Image 15, a still from Exhibit 7, Timecode 01:27 – Cronin encouraging other rioters to kick open Senate Wing Door*

Among the rioters who entered the building at that time were Cronin's brother, Kevin, at 2:13 p.m. Inside, Cronin was reunited with Kevin. The brothers remained in the hallway next to the Senate Wing Door and looked for Cronin Sr., who entered the Capitol building at 2:14 p.m. During that time, Cronin picked up a piece of lumber from the ground.



*Image 16, a still from Exhibit 7, Timecode 01:48 – Kevin (left) looking outside for Cronin Sr., and Cronin (right) picking up a piece of lumber*



*Image 17, a still from Exhibit 7, Timecode 02:07 – Cronin Sr. (left) entering Capitol building, Kevin (center) looking outside for Cronin Sr., and Cronin (right) holding a piece of lumber*

13

After Cronin and Kevin were reunited with Cronin Sr. (Image 18), Cronin ran ahead of the group towards the Senate side of the Capitol building, chanting "U-S-A!" and holding the piece of lumber he had just picked up. *See* Exhibit 5, Timecode 12:54.



*Image 18, a still from Exhibit 7, Timecode 02:23 – Cronin Sr., Kevin, and Cronin (left to right) reunited inside Capitol building, and Cronin holding a piece of lumber*



*Image 19, a still from Exhibit 5, Timecode 12:54 – Cronin chanting "U-S-A!" and running with a piece of lumber*

Cronin, Cronin Sr., and Kevin turned north and traveled through the Northwest Entry Corridor towards the Senate side of the Capitol building. They then travelled back by the route

they had entered to the Senate Wing Door, returning at 2:18 p.m. There, Cronin stood near the entrance and again waved rioters to enter the Capitol building. *See* Exhibit 7 at Timecode 05:43.



*Image 20, a still from Exhibit 7, Timecode 05:45 – Kevin (left) and Cronin (right) waving rioters into the Capitol building*

At 2:21 p.m., Cronin, Cronin Sr., and Kevin exited the Capitol building through the Senate Wing Door. Cronin Sr. remained at the Northwest Courtyard and did not re-enter the building.

At 2:24 p.m., Cronin and Kevin re-entered the Capitol building through the breached Senate Wing Door.



*Image 21, a still from Exhibit 7, Timecode 12:55 – Cronin and Kevin (left to right) re-entering Capitol building*

As detailed in Kevin's sentencing memorandum, which is attached as Exhibit 2, Cronin and Kevin traveled together further into the Capitol building to the Crypt, the Memorial Door, the Memorial Stair, Statuary Hall, and the Statuary Hall connector, which is a hallway leading to the House of Representatives' Chamber.

When Cronin, Kevin, and the mob of rioters arrived in the Statuary Hall connector, they were stopped by a line of police officers attempting to keep the group from advancing any further towards the House of Representatives. At one point, Cronin turned around and again waved to others behind him to advance towards the police line, even jumping up to wave so that he could be seen above the crowd. *See* Exhibit 8, Timecode 01:51.



*Image 22, a still from Exhibit 8, Timecode 01:51 – Cronin (black glove) jumping up and waving other rioters to advance towards the police line (blue)*

At 2:35 p.m., Kevin turned around, retracing his steps and exited the Capitol. Less than one minute later, rioters at the front of the police line in the Statuary Hall connector pushed past officers and Cronin joined the surging mob that advanced. *See* Exhibit 8, Timecode 02:50. The mob advanced to the doors of the House Chamber, confronting officers and members on the other side of the doors who had barricaded the Chamber and drawn their weapons.



*Image 23 – Security personnel defending the House Chamber against the mob*[6]

Meanwhile, members of the House were sheltering in place in the House Gallery.



*Image 24 - House members sheltering in the Gallery*[7]

---

[6] J. Scott Applewhite, Associated Press, *available at* *https://www.npr.org/sections/pictureshow/2022/01/06/1070610129/photos-one-year-later-a-look-back-on-the-jan-6-insurrection.*(last visited June 14, 2023).

[7] Andrew Harnik, Associated Press, *available at* *https://www.npr.org/sections/pictureshow/2022/01/06/1070610129/photos-one-year-later-a-look-back-on-the-jan-6-insurrection* (last visited June 14, 2023).

At approximately 2:42 p.m., Cronin continued to parade through the House Corridors that encircle the House Chamber (Image 25). At that time, members of the U.S. House of Representatives and staff were still located in the House Chamber and attempting to evacuate.



*Image 25, a still from Exhibit 9, Timecode 00:09 – Cronin in House Corridors*

Cronin later told investigators that he heard a gunshot, which the government believes occurred at 2:44 p.m., when Ashli Babbitt was shot near the Speaker's Lobby. At that time, Cronin was in the House Corridors near the Speaker's Lobby (Image 26), where rioters around Cronin discussed the gunshot that had just been fired. *See* Exhibit 10, Timecode 00:09.



*Image 26, a still from Exhibit 10, Timecode 01:17 – Cronin in House Corridors*

Shortly thereafter, at 2:46 p.m., Cronin travelled to the Upper House Door, where he exited the building to the House steps on the East Front of the Capitol.



*Image 27, a still from Exhibit 11, Timecode 03:28 – Cronin exiting Capitol building at Upper House Doors*

Cronin briefly remained at the top of the House steps, filming, until 2:48 p.m., when he re-entered the building through the Upper House Door. At that point, Cronin knew that a gunshot had already been fired near him inside the building and, yet, he chose to enter on a third occasion.



*Image 28, a still from Exhibit 12, Timecode 02:49 – Cronin re-entering Capitol building through Upper House Doors*

Cronin traveled directly to the Speaker's Lobby door, where a gunshot had been fired less than five minutes prior (Image 29). Reinforcement police officers responded and removed rioters, including Cronin, to the foyer of the Upper House Door. *See* Exhibit 13, Timecode 1:21:00-1:24:30 (third-party video), and Exhibit 14, Timecode 09:00-13:00 (body worn camera).



*Image 29, a still from Exhibit 13, Timecode 1:21:04 – Cronin near Speaker's Lobby door*

Between 2:55 and 2:58 p.m., Cronin and other rioters who were positioned in the Upper House Door foyer (Image 30), until the group was forced out of the building by MPD officers (Image 31).



*Image 30, a still from Exhibit 14, Timecode 12:30 – BWC from Officer S.H. showing Cronin at Upper House Doors foyer*



*Image 31, a still from Exhibit 15, Timecode 07:02 – Cronin being removed from Capitol building by MPD officers*

Though Cronin had left the building, he still did not leave Capitol grounds. Cronin remained outside the Upper House Door, filming the events on his cell phone. By 3:43 p.m., Cronin had traveled to yet another area outside the Capitol, the Central East Steps, where he continued to film the events.



*Image 32, a still from Exhibit 16, Timecode 01:15 – Cronin on Central East Front steps*

By 4:29 p.m., Cronin, Cronin Sr., and Kevin reunited on the Upper West Plaza near scaffolding that had been erected for the inaugural ceremony. During his debrief with the FBI, Kevin advised agents that Cronin wanted to remain on the Capitol grounds after the family was reunited, as detailed in Exhibit 2. According to Kevin, Cronin wanted to stay to record video of the events on his cell phone. The Cronins stayed on the West Front of the Capitol grounds until dark and then returned to their hotel.

*Social Media*

After the attack on the January 6, Cronin spread misinformation about the 2020 election on the social networking website Parler.



*Image 33 – Parler profile showing Cronin with U.S. Capitol cover photo*



*Image 34 – Parler post on January 7, 2021 "echoing" a claim that a Chinese Communist Party (CCP) revolution was underway*



*Image 35 – Parler post on January 9, 2021, "echoing" claim about "vote switching"*

In the days following January 6, Cronin also promoted the Proud Boys organization, which at that time was receiving press coverage for the group's role in the attack on the Capitol.



*Image 36 – Parler post on January 9, 2021, promoting Proud Boys membership*



*Image 37 – Parler post on January 9, 2021, promoting interview with Proud Boys members about the attack on the Capitol*

*Cronin's Interview*

On April 7, 2023, Cronin participated in a debrief with FBI agents pursuant to the terms of his plea agreement. Cronin told agents that he, Cronin Sr., and Kevin decided to attend former President Trump's speech in Washington, D.C. on January 6, 2021. Cronin came up with the idea and paid the airfare for all three to attend. On January 5, 2021, Cronin, Cronin Sr., and Kevin flew from Seattle to Washington, D.C., arriving in the early evening.

On January 6, 2021, they woke up early and walked towards the Ellipse to attend the rally. After they arrived at the rally entrance, they stood in line to get into the venue. Cronin advised that they were not allowed entrance because he was wearing a plate carrier. Cronin claimed that he brought the plate carrier as a defense against counter protesters, not against the police.

Cronin advised agents that he, his father, and brother made their way to the Washington Monument, where they arrived around mid-morning. Cronin told FBI agents that when he arrived on the Capitol grounds, he did not see any barriers keeping people out. Cronin told FBI agents that he only recalled seeing a police line at the Upper West Plaza, where officers were keeping the crowd away from the building, and that he wanted to film the scene near the barricade line. This is inconsistent with evidence that Cronin encountered police officers in the House connector hallway, near the Speaker's Lobby door, and at the Upper House Door, where he was in fact removed by officers.

Cronin told agents he was taking video and watching the crowd at the Upper West Plaza when a grenade went off next to Cronin Sr. and police officers began to deploy tear gas. Cronin admitted hearing police officers saying, "Get back." Cronin admitted to picking up a fire extinguisher at the Upper West Plaza but denied discharging it towards the police barricade line. Cronin told agents that he did not know why he stayed at the Capitol; however, at the time, he did

not expect anything was going to happen, in spite of the fact that he was wearing a plate carrier, hard knuckle gloves, and, at various times, picked up a fire extinguisher and large pieces of wood.

Cronin attempted to minimize his role by claiming that he was caught up in "political emotion" with a mass of people heading up the stairs towards the Upper West Terrace. He claimed that he only moved with the crowd in disbelief because it moved "like flowing water." Cronin claimed that he did not see any police officers when he got to the Upper West Terrace, so he continued with the crowd to the Senate Wing Door. He saw people banging on the window to the left of the Senate Wing Door. Cronin admitted to kicking the outside of Senate Wing Door. At the time, he thought to himself, "Looks like people are going to get in. Let's get in there." Cronin admitted to breaking a windowpane adjacent to the Senate Wing Door, but he attempted to minimize his behavior by saying, "Regrettably, I broke the window… I wasn't there to harm anyone." Cronin claimed that he decided to go through the window because he wanted to get into building and "record history." At the time of his FBI interview, rather than expressing regret for his part in the violent breach of the Capitol, he grandiosely spoke of the event as if the violent attack would be written about in a positive light. On several occasions, Cronin recalled the events with awe, stating that the attack on the Capitol was "history making," "historical," and "something you will read in the history books."

Cronin admitted to entering the Capitol building and finding Kevin and Cronin Sr., but he claimed that they were "sightseeing." Cronin remembered picking up a wooden 2x4 piece of lumber but did not remember putting it down or where he left it. Cronin told agents that he did not attempt to break anything or hit anyone with the piece of lumber. Extensive review of video evidence by the government has not revealed what, if anything, Cronin did with the piece of

lumber. After a few minutes inside, Cronin and Kevin took Cronin Sr. outside because Cronin Sr. thought they should leave.

Cronin admitted that he repeatedly went back inside the Capitol but said it was only because he wanted to continue recording video. By urging others to join the mob pushing toward the House Chamber, of course, he was no passive videographer. He claimed that he did not recall hearing any alarms while inside the Capitol building, despite evidence to the contrary showing alarms going off in multiple locations where Cronin was located. *See, e.g.,* Exhibit 9, Timecode 00:00, and Exhibit 15, Timecode 07:02. After re-entering the Capitol building through the Senate Wing Door, Cronin and Kevin made their way through the Crypt. They continued and went up a flight of stairs to the second floor. Cronin remarked that it "felt like a tourist event, sightseeing." At some point, Cronin remembered Kevin asking, "You want to get out of here and find dad?" Cronin admitted that he wanted to stay inside the Capitol building and continue to record the events. Kevin turned around to find Cronin Sr. and separated from Cronin.

Cronin recalled hearing a gunshot shortly after he arrived near the House Chamber. At that point, reinforcement police officers responded and pushed people out of the building through the Upper House Door. Cronin claimed that he did not have any physical confrontations with police, which is inconsistent with his efforts to push through the police line in the Statuary Hall connector hallway and his removal with others by MPD from the Upper House Door foyer. Cronin remembered leaving, being outside, and then going back inside to get more video footage of the events. Cronin remembered experiencing disbelief after hearing someone was shot. He subsequently left the building through the Upper House Door and continued to record video of the events outside on the East Front.

Agents asked whether Cronin had possession of any videos that he filmed on January 6. Cronin said that all of the videos that he took on January 6 were filmed on his work cell phone. Cronin claimed that his work cell phone was reset approximately mid-2021 by his employer without his knowledge and that all videos had been deleted. Agents asked Cronin about other files on his personal cell phone, including white supremacist images, which had not been deleted. Cronin advised agents that he maintained a large "archive" of various images on his personal cell phone, but, inexplicably, none were from January 6.

Agents asked Cronin about his activity on a Parler social media account, including his posts promoting the Proud Boys. Cronin denied any affiliation with the organization.

*The Charges and Plea Agreement*

On June 9, 2022, Cronin was charged by Amended Complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On June 13, 2022, Cronin, Cronin Sr., and Kevin were arrested in Puyallup, Washington. On July 5, 2022, Cronin was charged by Information with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On February 24, 2023, Cronin pleaded guilty to Count One of the Information charging a violation of 18 U.S.C. § 1752(a)(1) and Count Two of the Information charging a violation of 18 U.S.C. § 1361. Under the plea agreement, Cronin agreed to pay $500 in restitution to the Department of the Treasury.[8]

---

[8]   On January 6, 2023, Cronin Sr. pled guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), and Cronin Sr. was sentenced on April 12, 2023, to 18 months' probation, a $1,500 fine, and $500 restitution. ECF No. 66. On February 24, 2023, Kevin likewise pled guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), and Kevin was sentenced on June 9, 2023, to 30 days' incarceration and $500 restitution.

### III.     Statutory Penalties

Cronin now faces sentencing on one count of violating 18 U.S.C. § 1752(a)(1) and one count of violating 18 U.S.C. § 1361. As noted by the plea agreement, he faces up to one year of imprisonment and a fine of up to $100,000 per count. The defendant must also pay $500 in restitution under the terms of the plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Cronin's adjusted offense level under the Sentencing Guidelines as follows:

Count 1: 18 U.S.C. § 1752(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A) | Trespass at Restricted Building | 2 |
| | **Total** | **6** |

Count 7: 18 U.S.C. § 1361

| | | |
|---|---|---|
| U.S.S.G. § 2B1.5 | Base Offense Level | 8 |
| U.S.S.G. § 2B1.5(b)(2) | Occurred at National Historical Landmark | 2 |
| | **Total** | **10** |

| Multiple Counts | | |
|---|---|---|
| § 3D1.1(a)(1) | Counts grouped as follows: | |
| | Group 1 is Count 1 (18 U.S.C. § 1752). | |
| | Group 2 is Count 7 (18 U.S.C. § 1361). | |
| | | |
| § 3D1.1(a)(2) & 3D1.3 | Offense levels applicable for each group: | |
| | Group 1: 6; | |
| | Group 2: 10. | |
| | Highest offense level: 10 | |
| § 3D1.1(a)(3) | Total units: 2 units, increase of 2. | |
| | Breakdown: Group 1: 1 unit; | |
| | Group 2: 1 unit | **12** |
| | | |
| § 3E1.1 | Acceptance of Responsibility | -2 |
| | | |
| | **Estimated Offense Level** | **10** |

*See* PSR at ¶¶ 33-52.

The U.S. Probation Office calculated Cronin's criminal history as a category I, which is not disputed. PSR at ¶ 55. Accordingly, the U.S. Probation Office calculated Cronin's total adjusted offense level, after acceptance, at 10, and his corresponding Guidelines imprisonment range at 6 to 12 months. PSR at ¶ 88. Cronin's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of the recommended sentence of 12 months' incarceration, 12 months' supervised release, 60 hours of community service, and $500 in restitution.

### A.     The Nature and Circumstances of the Offense

"The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Cronin's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

Cronin's conduct is among the most serious of all January 6 misdemeanants sentenced to date. Cronin arrived on the grounds of the U.S. Capitol by approximately 2:00 p.m. On the West Front of the Capitol at that time, Cronin would have witnessed individuals climbing on scaffolding, on the media tower, and on other structures that had been erected for the inauguration. It would

have been clear to Cronin that police lines had been violently penetrated and that rioters had caused property damage. Despite these circumstances, Cronin not only stayed but contributed to the violence and mayhem.

On the Upper West Plaza, Cronin observed rioters fighting police officers, the deployment of tear gas, chemical irritant sprays, and fire extinguishers, and the detonation of a flash bang. And then, he joined in, spraying a fire extinguisher at officers. Cronin's deployment of the fire extinguisher towards the police barricade line contributed to the violence and chaos on the West Plaza. It created a cloud that impaired officers' ability to see the many threats around them. Moreover, fire extinguishers commonly include substances that are irritating and even toxic to humans, further threatening the officers' health.[9]

Cronin chose to advance toward the Capitol building. When Cronin arrived at the Senate Wing Door, he saw others trying to break in through windows and the door itself. Rather than turning and running in the other direction, or even just standing by, Cronin joined in. Cronin kicked at the Senate Wing Door from the outside and, together with others, used a piece of lumber to break a windowpane adjacent to the Senate Wing Door. He facilitated the first and one of the most significant breaches that day. Cronin entered through that window as the thirteenth rioter to enter the Capitol building on January 6.

Cronin was dressed for battle, wearing a green military-style plate carrier and black hard-knuckle tactical gloves. While Cronin later claimed that he wore the plate carrier to protect himself against counter-protestors, by the time he entered the Capitol building, the only violence that Cronin had witnessed was between rioters and police officers. Cronin knew that violence directed

---

[9] *See, e.g.,* Fire Extinguisher Safety, National Capital Poison Control Center, https://www.poison.org/articles/fire-extinguisher-safety-184.

by rioters towards police officers would continue, and his costume, in addition to his conduct, contributed to the menacing appearance of the mob.

Upon entry, Cronin filmed and provided encouragement to two rioters who had entered through broken windows as they kicked the Senate Wing Door open from the inside. Rioters amassed outside then poured into the Capitol building. Cronin's actions in breaking the windowpane thus led directly to hundreds of rioters entering the Capitol building. At one point, Cronin stood in the foyer of the Senate Wing Door waving other rioters inside. Cronin was at the front of the mob and chose to participate in the violence and property damage taking place. When asked by FBI agents about his participation in the attack on the Capitol, rather than express remorse, Cronin not only minimized his involvement, but characterized his experience positively as "history making," "historical," and "something you will read in the history books."

Cronin unlawfully entered the Capitol building, not once, but three separate times, despite the evidence of property damage all around him and alarms blaring throughout the building. Of the three co-defendants, Cronin was inside for the longest amount of time—approximately 40 minutes—and he travelled to the most places while inside. Cronin travelled to the Northwest Entry Corridor and back to the Senate Wing Door. When he re-entered for a second time with his brother, he traveled even further into the Capitol to the Crypt, the Memorial Door, Statuary Hall, and the Statuary Hall connector leading to the House Chamber.

In the connector hallway, Cronin, Kevin and a group of other rioters encountered a police line that had formed to stop rioters from getting any closer to the House of Representatives. Cronin's brother Kevin decided at that point to turn around and leave. But not Cronin. Instead, Cronin waved to other rioters behind him to press forward, jumping up so that he could be seen

waving. As soon as other rioters became violent with officers on the police line, Cronin joined the mob that broke through the police line and advanced on the House side of the building.

Cronin was just outside the House Chamber when members of the House of Representatives were attempting to evacuate to safety. Cronin was present at the House Corridors when Ashli Babbitt was shot in the nearby Speaker's Lobby. Even after hearing a gunshot inside the building—very near where Cronin was located—he decided to re-enter the Capitol building for a third time. Cronin travelled directly to the Speaker's Lobby door where the gunshot had been fired. After reinforcement police officers cleared Cronin and others from that area and directed them to the Upper House Door foyer, Cronin remained inside until he was forced back out by police officers. After Cronin finally departed, he stayed on the restricted grounds of the Capitol until dark with his father and brother.

Cronin filmed videos on a cell phone throughout his time at the Capitol on January 6. However, during his debrief interview, he claimed that all videos were deleted from his work cell phone without his knowledge by his employer sometime in mid-2021. Agents did not recover any videos or pictures from Cronin's work cell phone. Cronin claimed that he kept an "archive" of images on his personal cell phone. Yet, videos and pictures from January 6 were conspicuously absent from his archive. The government does not currently have evidence to refute Cronin's claim that his employer deleted his videos. Nevertheless, based on Cronin's lack of remorse, his multiple statements to the FBI about the "historical" importance of January 6, his statement to the FBI that he kept an "archive" of images on his phone but none from January 6, and his relative sophistication as a senior help desk technician at an information technology company (*See* PSR ¶ 74) and military intelligence systems technician (*See* PSR ¶ 79), the government suspects Cronin deleted or hid the videos that he filmed on January 6.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 12 months' incarceration in this matter.

### B.    Cronin's History and Characteristics

As set forth in the PSR, Cronin is a high school graduate who served as a U.S. Army Reservist between January 2015 and January 2023. PSR ¶¶ 71-72. Cronin's military service, while admirable, stands in stark contrast to his actions on January 6, 2021. Cronin violently broke into the U.S. Capitol building wearing a military-style plate carrier that he had decorated with a Confederate flag, a symbol of rebellion against the country that he swore an oath to protect.

During his debrief interview, Cronin did not take the opportunity to express remorse for his criminal conduct.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.    The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by Cronin. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The Government's recommended sentence is also designed to discourage Cronin from ever again using force in pursuit of his political goals. Cronin's actions on January 6 far exceeded those of many other rioters who entered and demonstrated inside the Capitol building. Many of those less culpable than Cronin have gone to great lengths to express regret and contrition for their crimes. Cronin, however, has not expressed remorse for his participation in the attack. Far from it, during his debrief interview, Cronin talked about January 6 in grandiose terms, as if he was proud to have participated in "something you will read in the history books." Cronin minimized the seriousness of his conduct and the events of January 6 more broadly. He gave misleading information to investigators, including claims that he did not discharge the fire extinguisher, he only saw police officers at the Upper West Plaza, and he never had a physical confrontation with

36

police officers. In the days following January 6, Cronin spread misinformation about the election and promoted membership in the Proud Boys organization. Perhaps most importantly, Cronin disregarded his military oath by engaging in violence against a branch of his own government. Cronin has not given the Court any reason to believe that he would not engage in future violence or property damage to satisfy his political goals and, therefore, presents a risk of reoffending.

Given Cronin's actions that day both inside and outside the U.S. Capitol building, and his lack of remorse, it is important that he be deterred and supervised.

### E.    The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on police officers, to conspiracy to corruptly interfere with Congress.[10] This Court must sentence Cronin based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Cronin has pleaded guilty to Count One of the Information in violation of 18 U.S.C. § 1752(a)(1) and Count Seven in violation of 18 U.S.C. § 1361. These offenses are Class A misdemeanors. 18 U.S.C. § 3559.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the

---

[10] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent.

Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. Case comparisons show that Cronin is among the most serious of all misdemeanor defendants, including because he engaged in violence, destroyed property in order to break inside the building (facilitating the first breach of the Capitol), entered the building multiple times, urged others to join a mob surging against the police, and has been remorseless.

In the case of Cronin's co-defendants, this Court sentenced Cronin Sr.—who entered on one occasion and did not engage in violence or property destruction—to 18 months' probation, a $1,500 fine, and $500 restitution. ECF No. 66. Additionally, the Court set as a condition of probation that Cronin Sr. perform 100 hours of community service. *Id.* The Court sentenced Kevin—who entered on three occasions and did not engage in violence or property destruction— to 30 days' incarceration and $500 restitution. ECF No. 80. In the instant case, the government requests a sentence of 12 months' incarceration followed by 12 months of supervised release and $500 restitution because Cronin's conduct is demonstrably more egregious than his father and brother's. Unlike Cronin Sr. and Kevin, Cronin discharged a fire extinguisher at police officers at the Upper West Plaza; he was at the front of the group of rioters and kicked the Senate Wing Door; he used a piece of lumber to break a windowpane; and he was the thirteenth rioter to enter the

building. The government does not have evidence that Cronin Sr. or Kevin carried an object like a piece of lumber that Cronin carried, which could be used as a weapon or to destroy property, as Cronin did, or shouted chants while inside. Cronin returned to the Senate Wing Door foyer where he waved other rioters to enter the building. Cronin Sr. and Kevin showed disrespect for the building by smoking cigarettes, but they did not incite others to enter. Unlike Cronin Sr., the two brothers, Cronin and Kevin, re-entered the building on a second occasion, travelling deep into the Capitol to the Crypt, the Memorial Door, Statuary Hall, and to a connector hallway leading to the House Chamber. Cronin and Kevin were part of a mob that choked the hallways of the Capitol, unlike Cronin Sr. When Kevin saw the police line in the House connector hallway, he decided to leave. Cronin's reaction was to jump up to wave other rioters forward and to join the advancing mob. Unlike Cronin Sr. and Kevin, Cronin paraded through the House Corridor while Members of Congress and staff were evacuating the building. Even after hearing a gunshot inside the building, Cronin re-entered on a third occasion through the Upper House Door and traveled directly to the area where the shot had been fired. Cronin remained inside until MPD officers physically removed rioters from the Upper House Door foyer.

To date, there has not been a January 6 defendant sentenced for violating both 18 U.S.C. § 1361 and 18 U.S.C. § 1752(a)(1). In *U.S. v. Troy Faulkner*, 21-cr-00126 (BAH), the defendant plead guilty to single a felony violation of 18 U.S.C. § 1361. Faulkner kicked two exterior windows of the Capitol building on the west front of the building. Unlike Cronin, however, Faulkner never entered the building, turned himself into the FBI, and self-reported the damage he had done to windows. Then-chief judge Howell sentenced Faulkner to five months' incarceration, followed by 36 months of supervised release, and $10,560 restitution. Though Cronin is charged with misdemeanors (with a § 1361 violation based on a single windowpane valued by the Architect of

the Capitol at under $1,000), his conduct is more egregious than Faulkner's. Again, Cronin was disruptive at the Upper West Plaza, at one point wielding and spraying a fire extinguisher; he assisted in the very first breach of the building by breaking a windowpane with a piece of lumber; he chanted inside the Capitol and carried around a piece of lumber; he waved others into the building and towards the police line in the House connector hallway; he entered the building on three occasions; and he traveled to many locations deep inside the Capitol, including near the House Chamber while Members of Congress and staff were evacuating.

The Court could also consider the eight-month sentenced imposed in *United States v. Simon*, 21-cr-346 (BAH). Simon pled guilty to a single misdemeanor violation of 18 U.S.C. § 1752(a)(2). Simon's case shares some similarities with Cronin's: Simon wore a plated vest, confronted police officers (in his case, by working with other rioters to push a metal rack against officers), stayed in the Capitol for an extended period of time (over an hour), did not show remorse after January 6, and made dishonest statements to the FBI. Gov. Sent. Mem., *United States v. Simon,* No. 21-cr-346 (BAH), ECF No. 59, at 2 (D.D.C. filed Aug. 2, 2022). Simon, however, did not destroy property, let alone in an act that contributed to hundreds of rioters' illegal entry into the building or turn a fire extinguisher into a weapon.

Misdemeanor defendant Russell Alford also received a 12-month sentence. *United States v. Alford,* 21-cr-263 (TSC). While Alford went to trial and gave false testimony, many of the facts of his case are far less aggravated than Cronin's. For example, Alford entered the Capitol through a door that he knew had been broken; Cronin discharged a fire extinguisher towards police officers, personally tried to break down a door, and then broke a window. Alford entered the Capitol once; Cronin entered three times. *See* Gov. Sent. Mem., *United States v. Alford,* 21-cr-263 (TSC), ECF No. 108, at 2 (D.D.C. filed Jan. 26, 2023).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V. Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[11] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering

---

[11] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, also applies here since the offenses of conviction include 18 U.S.C. § 1361. *See* 18 U.S.C.  § 3663A(c)(1)

from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Cronin must pay $500 in restitution.[12] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* Cronin's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 110.

## CONCLUSION

Balancing the 3553(a) factors, the government recommends that this Court sentence Cronin to 12 months' incarceration, 12 months' supervised release, 60 hours of community service, $500 in restitution, and the mandatory $50 special assessment. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior.

<div style="margin-left: 40%">

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY

By:   s/ *Will N. Widman*
WILL N. WIDMAN
Trial Attorney, Detailee

</div>

---

[12] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

**CERTIFICATE OF SERVICE**

On this 11th day of July, 2023, a copy of the foregoing was served upon all parties

listed on the Electronic Case Filing (ECF) System.


By:      s/ *Will N. Widman*
         WILL N. WIDMAN
         Trial Attorney, Detailee