## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-CR-00233 (ABJ)** |
| **v.** | : | |
| | : | |
| **KEVIN M. CRONIN,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Kevin M. Cronin to 30 days' incarceration, a three-year term of probation, 60 hours of community service, and $500 in restitution.

### I.       Introduction

Defendant Kevin M. Cronin, a 52-year old U.S. Postal Service worker, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[1]

Cronin pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of 30 days' incarceration is

---

[1] Although the Statement of Offense in this matter, filed on October 21, 2022, (ECF No. 42 at ¶ 6) reflects a sum of more than $2.7 million for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol were $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

appropriate in this case because Cronin: (1) was near the front of the barricade line on the Upper West Plaza and Lower West Terrace where he witnessed violence between rioters and police officers, including various assaults, deployment of tear gas, chemical spray, and fire extinguishers, and the detonation of a flashbang, and heard dispersal orders being projected by police through a loudspeaker, but nonetheless joined a mob of hundreds who advanced forward to enter the Capitol building; (2) entered the Capitol building through the Senate Wing Door less than two minutes after that door was first breached—a breach that was accomplished with the assistance of one of his sons—making him fully aware of the potential for violence and property destruction; (3) traveled further into the Capitol to the Northwest Entry Corridor, where he turned around and returned to the Senate Wing Door; (4) smoked a cigarette inside the Capitol building; and (5) later attempted to disseminate false information to a Facebook contact that the government had fabricated video evidence showing Dylan Cronin (his son) breaking a windowpane near the Senate Wing Door.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts of and circumstances of Cronin's crime support a sentence of 30 days' incarceration.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 42 (Statement of Offense), at ¶¶ 1-7.

*Cronin's Role in the January 6, 2021 Attack on the Capitol*

Defendant Kevin M. Cronin (Cronin), who lives in Puyallup, Washington, traveled to Washington, D.C. with his co-defendant sons Kevin M. Cronin II (Kevin) and Dylan R. Cronin (Dylan) to attend the "Stop the Steal" rally on January 6, 2021. As shown in Images 1 and 2, Cronin attended the rally wearing what appears to be a green jacket and red hat with stitched white lettering, "TRUMP 2020;" Kevin was wearing a black jacket and red hat with stitched white lettering, "Make America Great Again," and stitched yellow leaves on the brim; and Dylan was wearing a green military-style plate carrier, black long sleeve shirt, black gloves, black pants, and red hat with stitched white lettering, "Make America Great Again." In other images, Cronin, Kevin, and Dylan are shown using various face coverings throughout the day.



*Image 1, a still from Exhibit 1, Timecode 0:35 – Cronin, Dylan, and Kevin (left to right) in Washington, D.C. on January 6*



*Image 2, a still from Exhibit 2, Timecode 18:58 – Kevin, Dylan, and Cronin (left to right)*

After the rally, between approximately 12:00 and 1:00 p.m., Cronin, Kevin, and Dylan marched to the Capitol building, as shown in Image 3.



*Image 3 – Cronin and Kevin (left to right) marching to Capitol*

By approximately 2:00 p.m., Cronin, Kevin, and Dylan made their way up the West Front of the Capitol grounds to the Upper West Plaza. As shown in Images 4, 5, 6, and 7, Cronin and his sons were near the front of the barricade line. There, they observed violence between rioters and

4

police officers, including the deployment of tear gas, chemical irritant sprays, and fire extinguishers, as well as a flashbang detonation.



*Image 4 – Cronin, Dylan, and Kevin (left to right) near Lower West Terrace*



*Image 5, a still from Exhibit 3, Timecode 3:01 – Cronin, Kevin, and Dylan (left to right) at Upper West Plaza*

Cronin is shown in Images 6 and 7 holding a face covering over his nose and mouth to avoid breathing in airborne chemical irritants.



*Image 6, a still from Exhibit 4, Timecode 9:11 – Cronin at Upper West Plaza*



*Image 7, a still from Exhibit 5, Timecode 2:05 – Cronin at Upper West Plaza*

On the Lower West Terrace, a short distance from where Cronin and his sons were standing, the Metropolitan Police Department ("MPD") played a dispersal order telling all people to leave the area, which can be heard in Exhibit 3, Timecode 1:15. Approximately every 30 seconds, a loudspeaker announced the message, "This area is now a restricted access area

pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon." Cronin, Kevin, and Dylan ignored the dispersal order and advanced toward the Capitol building.

At approximately 2:10 p.m., as shown in Image 8, Cronin, Kevin, and Dylan ascended the Northwest Staircase to the Upper West Terrace.



*Image 8, a still from Exhibit 6, 2:10 p.m. – Dylan, Cronin, and Kevin, identified by yellow arrows (left to right) at Northwest Staircase*

By approximately 2:11 p.m., a group of rioters, including Kevin and Dylan, made their way across the Upper West Terrace and Northwest Courtyard to the Senate Wing Door of the Capitol building. As shown in Exhibit 4, Timecode 11:00 through 13:00, several rioters—including Dylan—kicked the Senate Wing Door from the outside and smashed glass windows adjacent to the door in an attempt to gain entry to Capitol building.

At approximately 2:13 p.m., as shown in Exhibit 7, the Capitol building was first breached by a rioter who jumped through a window adjacent to the Senate Wing Door, which had been broken by Dylan and others.



*Image 9, a still from Exhibit 7, 2:13 p.m. – First rioter enters Capitol building*

Less than one minute later, rioters who had entered through broken windows kicked open the Senate Wing Door from the inside. Many rioters who had amassed outside the Senate Wing Door then entered the Capitol building.



*Image 10, a still from Exhibit 7, 2:13 p.m. – Dylan observing other rioters kick open Senate Wing Door*

At approximately 2:13 and 2:14 p.m., Kevin and Cronin, respectively, entered the Capitol building through the breached Senate Wing Door and they were reunited with Dylan. As shown in Image 11, Dylan was carrying a piece of lumber.



*Image 11, a still from Exhibit 7, 2:14 p.m. – Cronin, Kevin, and Dylan (left to right) reunited inside Capitol building, and Dylan holding a piece of lumber*

Cronin, Kevin, and Dylan turned north and traveled through the Northwest Entry Corridor towards the Senate side of the Capitol building, as shown in Images 12 and 13.



*Image 12, a still from Exhibit 8, Timecode 0:27 – Kevin, Dylan, and Cronin (left to right) in Northwest Entry Corridor*

9



*Image 13, a still from Exhibit 9, 2:15 p.m. – Dylan, Cronin, and Kevin (left to right)
near North Doors Reception Area*

Cronin, Kevin, and Dylan then travelled back by the route they had entered to the Senate

Wing Door foyer, where they arrived at approximately 2:18 p.m. There, Cronin and Kevin smoked

cigarettes inside the Capitol building, as shown in Images 14 and 15.



*Image 14, a still from Exhibit 7, 2:19 p.m. – Kevin and Cronin (left to right)
smoking cigarettes inside Capitol building*



*Image 15, a still from Exhibit 10, Timecode 23:33 - Cronin and Kevin (left to right) at Senate Wing Door foyer*

At approximately 2:21 p.m., Cronin, Kevin, and Dylan exited the Capitol building through the Senate Wing Door, as shown in Image 16. Cronin was inside the Capitol building for approximately seven minutes and he did not re-enter.



*Image 16, a still from Exhibit 7, 2:21 p.m. – Dylan, Cronin, and Kevin (left to right) exit Capitol building*

As further detailed in Kevin's Statement of Offense, ECF No. 45, at approximately 2:24 p.m., Kevin and Dylan re-entered the Capitol building through the Senate Wing Door.

Cronin waited outside at the Northwest Courtyard while his sons paraded inside the building. Kevin and Dylan traveled together to the Crypt, the Memorial Door, Statuary Hall, and to a connector hallway leading to the House Chamber. At approximately 2:35 p.m., Kevin turned around and travelled back by himself, taking the route that he had entered. Kevin exited the building through a broken window adjacent to the Senate Wing Door at approximately 2:38 p.m.

At approximately 2:40 p.m., surveillance video showed Kevin at the Northwest Courtyard. Subsequently, Cronin and Kevin were reunited at that location, as shown in Image 17.



*Image 17, a still from Exhibit 11, Timecode 0:28 – Kevin and Cronin (left to right) at Northwest Courtyard*

As further detailed in Dylan's Statement of Offense, ECF No. 50, at approximately 2:42 p.m., Dylan traveled by himself to the Upper House Door. There, at approximately 2:47 p.m., Dylan exited the Capitol building to the top of the House Steps. At approximately 2:48 p.m., Dylan re-entered the building through the Upper House Door and remained in the foyer area of that door until approximately 2:57 p.m., when he and other rioters were physically forced out of the building by police officers. By approximately 3:43 p.m., Dylan had traveled to the Central East Steps of the Capitol grounds.

While Dylan remained inside the Capitol building and, ultimately, exited the building at the East Front, Cronin and Kevin remained on the West Front for almost two hours. By approximately 4:29 p.m., Cronin, Kevin, and Dylan were reunited on the Lower West Terrace near scaffolding that had been erected for the inaugural ceremony, as shown in Image 18.



*Image 18, a still from Exhibit 12, Timecode 17:43 – Cronin, Dylan, and Kevin (left to right) at Lower West Terrace*

The government does not have evidence that Cronin personally engaged in any destructive or violent activity while on the Capitol grounds or inside the building.

*Cronin's Interview*

On March 17, 2023, Cronin participated in a debrief with FBI agents pursuant to the terms of his plea agreement. Cronin told agents that he decided to take a "spur of the moment trip" to Washington, D.C. to see former President Trump speak, since Cronin had never attended a rally and he believed it could be his last chance. According to Cronin, Dylan organized the trip and paid airfare for all three family members. On January 5, 2021, Cronin and his sons flew from Seattle, Washington, to Washington, D.C. The Cronins stayed at a hotel close to the National Mall and walked wherever they went while in D.C.

13

Cronin told agents that on January 6, 2021, he, Kevin, and Dylan walked to the National Mall to attend the "Stop the Steal" rally. Cronin recalled former President Trump said during his speech that he was going to the Capitol, so Cronin and his sons decided to go to the Capitol as well. The Cronins stayed until the end of Trump's speech and then walked from the Washington Monument to the Capitol, with many others who were in attendance.

Upon arriving at the Capitol, Cronin recalled seeing stacks of barricade fencing piled to the side of the pathway that he took onto the grounds. Cronin made his way to the Lower West Terrace, where he observed police officers maintaining barricade lines and deploying tear gas to disperse rioters. Cronin described the scene at the Lower West Terrace as a "shitshow," but he stayed, nonetheless, "because everyone else stayed." Cronin denied having any physical confrontations with police officers at any point on January 6.

Next, Cronin told agents that he and his sons walked underneath scaffolding and climbed the steps of the Capitol building, ultimately making their way to the Senate Wing Door. Cronin saw someone breaking a window adjacent to that door; however, he claimed that he did not see Dylan break any window. Cronin told agents that he did not believe the government's charges that Dylan was responsible for breaking a window. Cronin did not see Dylan or Kevin enter the building. Cronin entered the Capitol building through the breached Senate Wing Door because "the door was opened and everyone else was walking in." Cronin remarked that he wished he had physically grabbed his sons and left the Capitol prior to their entry. Cronin stated, "[We] never should have been there."

Cronin recalled smoking inside the Capitol building, stating, "I did it because I smoke." Cronin decided to leave the building because there were too many people inside and he was

experiencing knee pain. Cronin and his sons departed the building through the Senate Wing Door. Cronin estimated that he spent approximately five minutes inside.

Cronin advised that after he and his sons departed the building, Dylan wanted to go back inside to record video of the events. Some time later, Cronin recalled sending Kevin back inside to find Dylan and bring him out. Cronin waited near the Senate Wing Door for Kevin and Dylan. When Kevin eventually returned, he told Cronin that he could not find Dylan. According to Cronin, Kevin made several attempts to call Dylan on his cell phone and eventually made contact. Cronin and Kevin met Dylan outside, near the House of Representatives side of the building. Once reunited, Cronin and his sons returned to the Lower West Terrace and then departed the Capitol grounds on the West Front.

*Social Media Activity*

During Cronin's debrief, agents reviewed his social media accounts. A review of Cronin's Facebook activity showed Cronin attempted to contact a journalist regarding the authenticity of video taken on January 6 that showed Dylan breaking a windowpane near the Senate Wing Door; however, the journalist did not respond. Additionally, Cronin had a conversation with a Facebook contact wherein he falsely claimed that the government used edited video of Dylan to form the basis of a criminal charge. Cronin informed his Facebook contact that he believed Dylan's plea offer did not mention destruction of property (which it did) because the government knew it was using "fake evidence."[2]

---

[2] The government strongly disputes Cronin's claim and directs the Court to Dylan's signed plea agreement (ECF No. 49), wherein Dylan entered a guilty plea to Count Seven of the Information, charging Dylan with Damaging Property of the United States in violation of Title 18, U.S. Code, Section 1361, and Dylan's signed statement of offense (ECF No. 50), wherein Dylan acknowledged that he "used a piece of lumber to break the lower right pane of glass of a window to the right of the exterior Senate Wing door." *Id.* at p. 3.

*The Charges and Plea Agreement*

On June 9, 2022, Cronin was charged by Amended Complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On June 13, 2022, Cronin, Kevin, and Dylan were arrested in Puyallup, Washington. On July 5, 2022, Cronin was charged by Information with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On January 6, 2023, Cronin pleaded guilty to Count Six of the Information charging a violation of 40 U.S.C. § 5104(e)(2)(G). Under the plea agreement, Cronin agreed to pay $500 in restitution to the Department of the Treasury.[3]

## III.    Statutory Penalties

Cronin now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement, he faces up to six months of imprisonment and a fine of up to $5,000.[4] The defendant must also pay $500 in restitution under the terms of the plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the

---

[3]    On January 19, 2023, Kevin likewise pled guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). Kevin will be sentenced on May 11, 2023. On February 24, 2023, Dylan pled guilty to one count of violating 18 U.S.C. § 1752(a)(1) and one count of violating 18 U.S.C. § 1361. Dylan will be sentenced on June 23, 2023.

[4] Because Cronin has pleaded guilty to a petty offense, a term of supervised release is not authorized. *See* 18 U.S.C. § 3583(b)(3).

defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of the recommended sentence of 30 days' incarceration, three years' probation, 60 hours of community service, and $500 in restitution.

### A.    The Nature and Circumstances of the Offense

"The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Cronin's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Cronin, the absence of violent or destructive acts is not a mitigating factor. Had Cronin engaged in such conduct, he would have faced additional criminal charges.

Cronin arrived on the grounds of the U.S. Capitol and entered the Capitol building at approximately 2:14 p.m. In order to gain entry to the Capitol at that time, he would have crossed over broken down barricades and passed by bike racks that were intended to prohibit entry into the restricted area of the Capitol's grounds. Prior to entering the Capitol building, Cronin observed rioters fighting police officers, the deployment of tear gas, chemical irritant sprays, fire extinguishers, and the detonation of a flash bang. Cronin was within earshot of a dispersal order

17

that was being repeatedly projected at a high volume from a loudspeaker by MPD officers. On the West Front of the Capitol at that time, Cronin would have witnessed individuals climbing on scaffolding, on the media tower, and other structures that had been erected for the inauguration. It would have been clear to Cronin that police lines had been penetrated and that rioters had caused property damage. Despite these circumstances, Cronin told investigators that he stayed because everyone around him stayed.

Together with his sons, Cronin joined a crowd that advanced toward the Capitol building and made entry through a non-public entrance at the Senate Wing Door less than one minute after the Capitol was first breached by his own son, Dylan, and others. Thus, Cronin took advantage of the opportunity presented by the mob, ignored the violence and property damage taking place, and unlawfully entered the Capitol building.

While inside the Capitol and over the course of approximately seven minutes, Cronin continued to protest, despite the evidence of property damage around him and hearing alarms blaring throughout the building. Cronin continued deeper into the Capitol to the Northwest Entry Corridor. After Cronin departed, he remained on the restricted grounds of the Capitol for almost two more hours.

Therefore, the nature and circumstances of the offense support the recommended sentence of 30 days' incarceration.

### B.     Cronin's History and Characteristics

In 2002 Cronin pled guilty to Actual Physical Control in Lawton, Oklahoma after a vehicular accident while under the influence of alcohol. He received a 30-day sentence, which was suspended. PSR ¶ 25.

As set forth in the PSR, Cronin served in the U.S. Marine Corps from December 1989 to December 1993, where he earned the rank of Corporal and received an honorable discharge. PSR ¶ 45. Cronin then served in the U.S. Army from March 1994 to January 2016, where he earned the rank of Sergeant First Class and he was honorably discharged. PSR ¶ 46. During his time in the U.S. Army, Cronin was deployed to Iraq, and he received awards and decorations for his military service. PSR ¶ 47. Although Cronin plainly deserves the country's thanks for his honorable military service, that service should have sensitized him to the grave risk of harm the January 6 riot posed to the police officers who were guarding the Capitol and the lawful occupants of that building.

Since October 2015, Cronin has been employed on a part-time basis by the U.S. Postal Service in Seattle, Washington, where he collects mail from businesses. PSR ¶ 44.

During his debrief, Cronin expressed remorse for his criminal conduct, telling FBI agents that he regrets that he did not physically grab his sons and leave the Capitol prior to entering the building. Cronin stated, "[We] never should have been there." When recommending an appropriate sentence, the government gives significant weight to the defendant's early acceptance of responsibility. Cronin is the first of the three co-defendants to plead guilty and accepted the government's plea offer at the earliest opportunity.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.

19

I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.     The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by Cronin. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The Government's recommended sentence should also discourage Cronin from engaging in such activity in the future. Unlike some other January 6 defendants, Cronin has accepted responsibility for his actions and did so at the earliest opportunity. However, as shown by Cronin's social media activity, he cast aspersions against the government following his and his sons' arrests

and questioned the authenticity of the government's evidence against Dylan. As late as his debrief with FBI agents in March 2023—after Dylan had entered a guilty plea for the crime of property damage—Cronin refused to believe that Dylan was responsible for breaking a window of the Capitol building. Given Cronin's actions that day both inside and outside the U.S. Capitol building, and his unwillingness to accept the veracity of the evidence against his family members, it is important that he be deterred and supervised. A period of 30 days' incarceration, 36 months of probation, and 60 hours of community service will adequately serve that purpose.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This Court must sentence Cronin based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Cronin has pleaded guilty to Parading, Demonstrating, or Picketing in the Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

22

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case:

24

Consider *United States v. Mark Simon*, Case No. 21-cr-00067 (ABJ), ECF No. 32 (Gov't Sentencing Memorandum). Simon, like Cronin, chose to ignore violence and chaos all around him, and advanced towards the Capitol. Like Simon, Cronin entered the Capitol building after it had been breached by others. As with Simon, Cronin was inside the Capitol for a shorter period of time and he did not travel many places. Unlike Simon, however, Cronin did not brag on social media about his participation in the events of January 6. Simon, like Cronin, pleaded guilty to violating Section 5104(e)(2)(G). This Court sentenced Simon to 35 days' incarceration. *Id*. ECF No. 38.

In *United States v. Russell Peterson*, 21-cr-309 (ABJ), Peterson, like Cronin, entered through the Senate Wing door, though Peterson entered ten minutes after the initial breach. Unlike Peterson, Cronin did not live stream the riot and did not brag on social media about his participation in the events. Peterson lied to agents about his participation in January 6; Cronin falsely asserted to a Facebook contact that the government had altered video evidence showing his son breaking a window. Like Cronin, Peterson pleaded guilty to violating Section 5104(e)(2)(G). This Court sentenced Peterson to 30 days' incarceration. *Id.* ECF No. 35.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. [6]

### V.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Cronin to

---

[6] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

30 days' incarceration, 36 months of probation, 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY

By:     s/ *Will N. Widman*
WILL N. WIDMAN
Trial Attorney, Detailee

**CERTIFICATE OF SERVICE**

On this 5th day of April, 2023, a copy of the foregoing was served upon all parties

listed on the Electronic Case Filing (ECF) System.


By:    <u>s/ *Will N. Widman*</u>
WILL N. WIDMAN
Trial Attorney, Detailee